IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CLEAN AIR COUNCIL, | ) |
| Plaintiff, | ) 2:19-cv-1072 |
| vs. | ) Judge Marilyn J. Horan |
| UNITED STATES STEEL CORPORATION, | ) |
| Defendant. | ) |

**OPINION AND ORDER**

Plaintiff Clean Air Council brings the present Complaint against Defendant United States Steel Corporation, alleging violations of the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601–75. (ECF No. 1). Defendant moves to dismiss the Complaint. (ECF No. 7). The parties have briefed the issues, (ECF Nos. 8, 12, 13), and argued the matter before the Court. The matter is now ripe for decision.

For the following reasons, Defendant United States Steel Corporation's Motion to Dismiss will be granted.

**I. Background**

United States Steel Corporation (U.S. Steel) owns and operates Mon Valley Works, which includes three facilities: the Clairton Plant, the Edgar Thomas Plant, and the Irvin Plant. (ECF No. 1, at ¶¶ 2, 25). The Clairton Plant produces coke and coke byproducts. *Id.* at ¶ 2. The coke and coke byproducts are transported to the Edger Thomas Plant for the production of steel slabs. *Id.* The Irvin Plant then finishes the steel slabs. *Id.* All three plants use coke oven gas, produced at the Clairton Plant, as fuel. *Id.* at ¶¶ 2, 38.

1

On December 24, 2018, a fire occurred at the Clairton Plant, leading to the shutdown of the No. 2 and No. 5 Control Rooms. *Id.* at ¶¶ 4, 42. The No. 2 Control Room removes light oil, which is made up of "benzene and other volatile organic compounds," from the coke oven gas. *Id.* at ¶¶ 4, 39. Similarly, the No. 5 Control Room removes sulfur from the coke oven gas. *Id.* The two control rooms remained shut down until April 4, 2019, when repairs were finally complete. *Id.* at ¶ 42; (ECF No. 1-3, at 6). During the 102 days that the No. 2 and No. 5 Control Rooms were out of operation, U.S. Steel continued to use the coke oven gas produced at the Clairton Plant as fuel. (ECF No. 1, at ¶¶ 43–44). The combustion of the unprocessed coke oven gas released "hydrogen sulfide, benzene, and other hazardous components into the ambient air from all three plants." *Id.* at ¶ 44. U.S. Steel reported the fire and releases to the Allegheny County Health Department, the local entity responsible for enforcing the Clean Air Act and other environmental and health laws, in accordance with local regulations and U.S. Steel's Clean Air Act permits. *Id.* at ¶ 83; (ECF No. 1-5, at 2); (ECF No. 1-8, at 3, 4).

On June 16, 2019, another fire happened at the Clairton Plant, again shutting down the No. 2 and No. 5 Control Rooms. (ECF No. 1, at ¶ 64). U.S. Steel reported the fire to the Allegheny County Health Department. *Id.* U.S. Steel again continued to produce coke oven gas and to use unprocessed coke oven gas as fuel at its plants. *Id.* at ¶ 65. On July 5, 2019, an air monitor recorded high benzene levels. *Id.* at ¶ 67.

The Clean Air Council, a nonprofit Pennsylvania corporation whose "mission is to protect and defend the right to a healthy environment," filed the present Complaint on behalf of itself and its members. *Id.* at ¶¶ 16–17. The Clean Air Council alleges that the releases of coke oven emissions, hydrogen sulfide, and benzene following the December 2018 and June 2019 fires were hazardous to the public and should have been reported to the National Reporting

Center (NRC) pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA).  *Id.* at ¶¶ 1, 6.  The Clean Air Council alleges that U.S. Steel failed, and continues to fail, to report the releases to the NRC.  *Id.* at ¶¶ 7–8, 58–60, 66, 69, 86–88.  U.S. Steel, however, seeks dismissal of the Complaint under Federal Rule of Civil Procedure 12(b)(6), arguing that the releases are exempt from CERCLA's reporting requirements.  (ECF No. 7).

**II. Legal standard**

In deciding a motion to dismiss a complaint under Rule 12(b)(6), a court must first "accept all factual allegations as true" and "construe the complaint in the light most favorable to the plaintiff." *Eid v. Thompson*, 740 F.3d 118, 122 (3d Cir. 2014) (internal quotations omitted).  The court then must "determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Id.*  A complaint is sufficient only when it is facially plausible, meaning that the court is able "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).  To be plausible on its face, the complaint must contain more than "[t]hreadbare recitals of the elements of a cause of action" and "mere conclusory statements." *Id.*  The court need not "accept unsupported conclusions and unwarranted inferences." *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013).

When a court grants a motion to dismiss, the court "must permit a curative amendment unless such an amendment would be inequitable or futile." *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 174 (3d Cir. 2010) (internal quotations omitted).  Amendment is futile "where an amended complaint 'would fail to state a claim upon which relief could be granted.'" *M.U. v. Downingtown High Sch. E.*, 103 F. Supp. 3d 612, 631 (E.D. Pa. 2015) (quoting *Great W. Mining & Mineral Co.*, 615 F.3d at 175).

**III. Discussion**

Congress enacted CERCLA "[t]o provide for liability, compensation, cleanup, and emergency response for hazardous substances released into the environment and the cleanup of inactive hazardous waste disposal sites." Pub. L. No. 96-510, 94 Stat. 2767 (1980). CERCLA requires, among other things, that as soon as a person in charge of a facility knows that a hazardous substance has been released "in quantities equal to or greater than" the statutorily defined limitations, that person must "immediately notify the National Response Center." 42 U.S.C. § 9603(a). The NRC then must "convey the notification expeditiously to all appropriate Government agencies, including the Governor of any affected State." *Id.* As noted in other circuits, these requirements are "to ensure 'the Government's ability to move quickly to check the spread of a hazardous release.'" *Ctr. for Biological Diversity, Inc. v. BP Am. Prod. Co.*, 704 F.3d 413, 428 (5th Cir. 2013) (quoting *United States v. Laughlin*, 10 F.3d 961, 966 (2d Cir. 1993)).

Congress nonetheless carved out exemptions from CERCLA's reporting requirements in the form of "federally permitted releases." 42 U.S.C. § 9603(a). Congress defined the term "federally permitted release" in relation to other environmental protection laws: the Clean Water Act (which includes the Federal Water Pollution Control Act); the Solid Waste Disposal Act; the Marine Protection, Research, and Sanctuaries Act of 1972; the Safe Drinking Water Act; the Clean Air Act; the Atomic Energy Act of 1954; and state laws related to crude oil and natural gas. 42 U.S.C. § 9601(10). Relevant here, federally permitted releases include "any emission into the air subject to a permit or control regulation under . . . the Clean Air Act." 42 U.S.C. § 9601(10)(H).

U.S. Steel argues that because its Mon Valley Works facilities are "subject to" permits issued under the Clean Air Act, the releases of coke oven emissions, hydrogen sulfide, and benzene were "federally permitted releases," and thus exempt from CERCLA's reporting requirements. (ECF No. 8, at 1–2, 4–5). According to U.S. Steel, "subject to" unambiguously means "affected by or possibly affected by," and does not require that the releases be in compliance with the permits in order to be exempt. *Id.* at 6–7. The Clean Air Council responds with several arguments, primarily that the federally permitted release exemption "does not apply to releases that are in violation of a permit." (ECF No. 12, at 2). The Clean Air Council contends that U.S. Steel's interpretation of "subject to" is not supported by the rest of CERCLA's statutory language, CERCLA's legislative history, Environmental Protection Agency (EPA) interpretation and guidance, or case law. *Id.* In sum, the issue before the Court is whether emissions from a facility that holds Clean Air Act permits are exempt from CERCLA's reporting requirements, regardless of whether the emissions comply with those permits. Or, put more succinctly, what does "subject to" in § 9601(10)(H) mean?

When tasked with interpreting a statute, including one that is administered by an administrative agency, the court's "goal . . . is to effectuate Congress's intent." *S.H. v. Lower Merion Sch. Dist.*, 729 F.3d 248, 257 (3d Cir. 2013) (internal quotations omitted); *United States v. Geiser*, 527 F.3d 288, 292 (3d Cir. 2008). Because Congress's intent is presumed to be "most clearly expressed in the text of the statute," *S.H.*, 729 F.3d at 257 (internal quotations omitted), the court's "analysis begins with the plain language of the statute," *Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009). If the statute's meaning is clear and unambiguous, then "judicial inquiry is complete," and the court should not go further. *S.H.*, 729 F.3d at 257; *In re Phila. Newspapers, LLC*, 599 F.3d 298, 304 (3d Cir. 2010); *see also Robinson v. Shell Oil Co.*, 519

U.S. 337, 340 (1997) ("Our inquiry must cease if the statutory language is unambiguous and the statutory scheme is coherent and consistent.") (internal quotations omitted).  On the other hand, if the disputed language is ambiguous, that is, "reasonably susceptible of different interpretations," the court may consider statutory purpose or legislative history.  *In re Phila. Newspapers*, 599 F.3d at 304 (internal quotation omitted); *Geiser*, 527 F.3d at 292–93.  Or, where Congress has delegated enforcement and rulemaking responsibility over the statute at issue to an administrative agency, the court must give deference to that agency's interpretation of the ambiguous language.  *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984); *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944).

      As to whether the words at issue are ambiguous, the court must "read the statute in its ordinary and natural sense," *In re Phila. Newspapers*, 599 F.3d at 304 (internal quotations omitted), by "assum[ing] that the ordinary meaning of that language accurately expresses the legislature purpose," *S.H.*, 729 F.3d at 257 (internal quotations omitted).  In "ascertain[ing] the ordinary meaning of words, '[w]e refer to standard reference works such as legal and general dictionaries.'"  *Da Silva v. AG of the United States*, 948 F.3d 629, 335 (3d Cir. 2020).  Along with the language itself, the court must also refer to "'the specific context in which that language is used, and the broader context of the statute as a whole.'"  *Monzon v. De La Roca*, 910 F.3d 92, 102 (3d Cir. 2018) (quoting *Robinson*, 519 U.S. at 341).  After all, it is the court's "'duty to construe statutes, not isolated provisions.'"  *Cen v. AG of the United States*, 825 F.3d 177, 193 (3d Cir. 2016) (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 568 (1995)).  As explained by the Supreme Court, "A 'word may have a character of its own not to be submerged by its association,'" but nonetheless, "the meaning of a word must be ascertained in the context of achieving particular objectives, and the words associated with it may indicate that the true

meaning of the series is to convey a common idea." *Chevron*, 467 U.S. at 860–61 (quoting *Russell Motor Car Co. v. United States*, 261 U.S. 514, 519 (1923)).

Here, the Court is tasked with interpreting the meaning of "subject to," as found in § 9601(10)(H) of CERCLA:

> The term "federally permitted release" means
> . . .
> (H) any emission into the air *subject to* a permit or control regulation under section 111, section 112, title I part C, title I part D, or State implementation plans submitted in accordance with section 110 of the Clean Air Act [42 USCS §§ 7411, 7412, 7470 et seq., 7501 et seq., or 7410] (and not disapproved by the Administrator of the Environmental Protection Agency), including any schedule or waiver granted, promulgated, or approved under these sections[.]

42 U.S.C. § 9601(10)(H) (emphasis added). To determine what this language means, and thus what emissions the exemption encompasses, the Court will look first at the dictionary definitions of "subject" and then turn to the context in which the disputed language occurs—§ 9601(10) as a whole, as well as the statutory schemes of CERCLA, the Clean Air Act, and other federal environmental laws.

First, Black's Law Dictionary defines the adjective form of "subject" in relevant part as "Under the power of dominion of another" or "Dependent on or exposed to (some contingency); esp., being under discretionary authority." *Subject*, *Black's Law Dictionary* (11th ed. 2019). Similarly, Merriam-Webster defines the term as "falling under or submitting to the power or dominion of another," such as "owing allegiance to or being a subject of a particular sovereign or state" or "obedient, submissive"; "suffering a particular liability or exposure" or "prone, disposed"; or "likely to be conditioned, affected, or modified in some indicated way: having a contingent relation to something and usually dependent on such relation for final form, validity, or significance." *Subject*, *Merriam-Webster's Third New International Dictionary, Unabridged*, http://unabridged.merriam-webster.com (last accessed May 06, 2020). These definitions do not

7

suggest that an emission that is subject to a permit is one that complies the permit as much as they convey that such an emission is one that *ought to comply* with the permit. Having a duty to comply is different from actually complying.

Moreover, when subsection (H) is compared with the other subsections of § 9601(10), it is plain that Congress intended to draw a distinction between compliance and a duty to comply. In the eleven subsections to the definition of "federally permitted release," Congress used a handful of phrases to exempt various kinds of releases from CERCLA's reporting requirements. In six of the subsections, Congress carved out exemptions for discharges and releases that are "in compliance with" permits, regulations, or other standards under the Federal Water Pollution Control Act, the Solid Waste Disposal Act, the Marine Protection, Research, and Sanctuaries Act of 1972, the Clean Water Act, and the Atomic Energy Act of 1954. 42 U.S.C. § 9601(10)(A), (D)–(F), (J)–(K). Congress similarly used "authorized under" in two subsections in relation to the Safe Drinking Water Act and state law programs. 42 U.S.C. § 9601(10)(G), (I). Two other subsections exempt discharges occurring under circumstances identified by the Federal Water Pollution Control Act and by permits issued thereunder. 42 U.S.C. § 9601(10)(B)–(C). And lastly, Congress exempted any emissions into the air that are "subject to" permits issued under the Clean Air Act. 42 U.S.C. § 9601(10)(H). If Congress had intended that air emissions must be "in compliance with" a Clean Air Act permit in order to be exempt, Congress could have— and would have—said so, just as it did six other times when defining "federally permitted release." That Congress chose to use different words in relation to the Clean Air Act in § 9601(10) is strong evidence of Congress's intent that releases regulated by the Clean Air Act should treated differently than releases regulated by other environmental acts.

This differential treatment of air emissions also makes sense in light of the greater statutory schemes of CERCLA, the Clean Air Act, and the other environmental statutes listed in § 9601(10). The Clean Air Act differs from the other statutes, in that it is has detailed requirements regarding risk management, emergency response, and accident reporting. 42 U.S.C. § 7412(r). For example, the Clean Air Act created the Chemical Safety and Hazard Investigation Board, and charged that Board with "establish[ing] by regulation requirements binding on persons for reporting accidental releases into the ambient air subject to the Board's investigatory jurisdiction." 42 U.S.C. § 7412(r)(6)(C)(iii). A failure to report a "release of any extremely hazardous substance" in accordance with the Board's regulations violates the Clean Air Act. 42 U.S.C. § 7412(r)(6)(O). Additionally, the Clean Air Act authorized the EPA "to promulgate release prevention, detection, and correction requirements which may include monitoring, record-keeping, [and] reporting," for the purpose of "prevent[ing] accidental releases of regulated substances." 42 U.S.C. § 7412(r)(7)(A). The Clean Air Act further requires owners and operators of facilities, like U.S. Steel, "to prepare and implement a risk management plan to detect and prevent or minimize accidental releases . . . , and to provide a prompt emergency response to any such releases in order to protect human health and the environment." 42 U.S.C. § 7412(r)(7)(B)(ii). The risk management plan must include "procedures for informing the public and local agencies responsible for responding to accidental releases, emergency health care, and employee training measures." 42 U.S.C. § 7412(r)(7)(B)(ii)(III).

The Clean Air Act's reporting and emergency response requirements appear to be quite similar to, if not duplicative of, CERCLA's requirements and purpose—as noted above, the purpose of CERCLA's reporting requirements is "to ensure the Government's ability to move quickly to check the spread of a hazardous release." *Ctr. for Biological Diversity, Inc.*, 704 F.3d

at 428 (internal quotations omitted).  And, given the longstanding tensions between industry and public health (particularly their attendant costs and benefits) it is understandable that Congress would not require a facility to comply with duplicative reporting requirements under both the Clean Air Act and CERCLA.

In summary, then, the phrase "subject to," as used in § 9601(10) of CERCLA, is unambiguous and does not require that the air emissions comply with a Clean Air Act permit in order to be exempt.  "Subject to" merely means that the responsible facility must abide by the requirements of that permit, as well as the requirements of the Clean Air Act and the reporting requirements found therein, rather than the reporting requirements of CERCLA.  U.S. Steel's operations at the Mon Valley Works facilities are subject to permits issued under the Clean Air Act, and thus the emissions at issue here are "federally permitted releases" and exempt under CERCLA.  The Clean Air Council's claim that U.S. Steel violated CERCLA by failing to report to the NRC the emissions following the December 2018 and June 2019 fires thus fails under Rule 12(b)(6).  Consequently, the Court does not need to reach the Clean Air Council's other arguments.

Lastly, the Court finds that amendment of the Complaint would be futile.  The Clean Air Council's claim was based on a faulty legal premise, and as such, there are no facts the Clean Air Council can allege to overcome its failure to state a claim for which relief may be granted.

**IV. Conclusion**

THEREFORE, based on the foregoing, Defendant U.S. Steel's Motion to Dismiss is GRANTED, and the Complaint is therefore dismissed.  FURTHERMORE, the Court finds that amendment is futile.  Accordingly, the case will be marked as closed.

IT IS SO ORDERED.

DATE May 14, 2020

_____
Marilyn J. Horan
United States District Judge